UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.    ) | Cause No. 1:21-CR-32-HAB |
| ) | |
| PAYNE T. RANDLE  ) | |

## OPINION AND ORDER

Defendant stands accused of five counts related to the illegal sale of narcotics and accompanying gun possession. These charges are based, in part, on a search warrant for 1901 Hillside Drive in Fort Wayne, Indiana ("Hillside Residence"). Defendant now challenges that search, moving both to suppress evidence found during the search and for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). (ECF No. 35, 37). Because the Court finds that Defendant has made a substantial preliminary showing that the search warrant for the Hillside Residence was based, at least in part, on a knowingly false statement in the probable cause affidavit, the request for a *Franks* hearing will be granted.

**I.  Background Facts**

In February 2021, Det. Daniel Radecki ("Radecki") was contacted by a FedEx manager about a suspicious package. The package, which Radecki obtained from the manager, was "heavily taped on all seams" and "contained an old shipping label that was handwritten." (ECF No. 37-1 at 1). The sender was listed as Lisa Thompson with a return address of 3660 Cowley Way, San Diego, CA 92117, and a contact number of 951-463-2246. The recipient was listed as James Thompson with a delivery address of 1901 Hillside Ave.[1], Fort Wayne, IN 46805, and a contact number of 260-243-6821.

---

[1] The Court notes that the actual address for the property 1901 Hillside Avenue, not Hillside Drive, which is the address used in the warrant application and warrant. However, Defendant does not raise the incorrect address as an

"Utilizing open source and closed source investigative tools," Radecki determined that neither phone number was valid. (*Id.* at 2). Radecki searched for the sender address and the search showed "no one named Lisa Thompson listed at the address." (*Id.*). Radecki then looked up "1901 Hillside," and found it to be a rental property. But "a Spillman[2] inquiry showed no one by the name of James Thompson being at the address." (*Id.*). Radecki also determined that the package had been shipped from a drop box. These facts led Radecki to believe the package may have been used to transport narcotics.

Radecki, who "has taken several courses and has previously successfully interdicted parcels containing narcotics," determined that his K9 partner "Brix" should conduct a sniff search of the package. (*Id.*). Brix indicated to the presence of narcotics in the package.

Taking Brix's nose for it, Radecki and "other members of the Allen County Drug Task Force" went to Hillside Ave. (*see* ECF No. 36-1) to "conduct a knock and talk." (*Id.*). After parking, Radecki exited his police car and "immediately noticed an overwhelming odor of raw/green marijuana that appeared to be coming from the residence." (*Id.*). Radecki was twenty-five to thirty feet from the home when he was struck by the aroma. Radecki found that the scent got stronger as he approached the door of the residence. "Allen County Drug Task Force Detectives who were assisting" with the "knock and talk" also reported that they smelled "a very strong odor." (*Id.*). Finding no one home, the officers left.

After obtaining a warrant to open the package, Radecki found two more boxes inside. The first contained around 500 grams of marijuana. The second contained around 391 grams of methamphetamine.

---

issue, and it likely isn't one. *United States v. Wade*, No. 07-CR-61, 2007 WL 2053960, at *4 (E.D. Wis. July 17, 2007) (collecting cases).
[2] Spillman is a computer database used by law enforcement.

Armed with the contents of the package and the "overwhelming odor" of marijuana, Radecki applied for a search warrant for the Hillside Residence. The warrant was issued by Allen County Superior Court Magistrate Samuel Keirns the same day. (ECF No. 37-1).

Officers continued to surveil the Hillside Residence as they waited for the issuance of the warrant. Those officers saw a vehicle back into the driveway of the home. An unknown male, later identified as Defendant, exited the Hillside Residence and placed a white container, blue container, and red duffle bag into the trunk. The vehicle then drove away. After a traffic stop, Radecki and Brix conducted an open-air sniff of the vehicle. Brix alerted to the presence of narcotics in the trunk. A search of the vehicle found marijuana (about ten ounces), methamphetamine, firearms, and other evidence of drug trafficking inside the containers loaded into the trunk.

The search warrant for the Hillside Residence was then executed. There, officers found additional firearms, 3.5 grams of marijuana in a clear plastic bag, and other evidence of drug trafficking. All these facts, from the report of the package to the search of the residence, occurred on the same day.

**B.**     **Legal Discussion**

Search warrant affidavits are presumed to be valid. *Franks*, 438 U.S. at 171. But a search warrant is invalid if police officers obtain it by deliberately or recklessly providing the issuing court with false, material information. *United States v. McMurtrey*, 704 F.3d 502, 504 (7th Cir. 2013). In *Franks*, the Supreme Court defined the procedure, evidentiary burdens, and proper remedies associated with a defendant's attack on the truthfulness of statements made in an affidavit supporting the issuance of a search warrant. To obtain a *Franks* hearing, the defendant must make a "substantial preliminary showing" of (1) a material falsity or omission that would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth. *McMurtrey*,

704 F.3d at 508; *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014); *see also*, *e.g.*, *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016); *United States v. Mullins*, 803 F.3d 858, 861–62 (7th Cir. 2015); *United States v. Robinson*, 546 F.3d 884, 887–88 (7th Cir. 2008). Merely to obtain a *Franks* hearing, however, a defendant need not prove the *Franks* violation. "Proof by a preponderance of the evidence is not required until the *Franks* hearing itself." *Glover*, 755 F.3d at 820. Still, allegations of falsehood or reckless disregard for the truth must be "accompanied by an offer of proof." *Franks*, 438 U.S. at 171.

Defendant identifies both falsities and omissions in support of his request for a *Franks* hearing. The Court finds that the falsities get him over the line. Defendant calls Radecki's affidavit testimony that he smelled an "overwhelming odor" of marijuana around the Hillside Residence "incredulous." (ECF No. 37 at 7). Defendant notes the small amount of marijuana found at Hillside Residence (3.5 grams), the physical structure of the home, and the proximity of other homes in the area as factors that render Radecki's statement "contrary to the laws of nature." (*Id*.).

The Court shares Defendant's suspicions. As Judge Walton Pratt of the Southern District has noted, claims that officers smell raw, or unburnt, marijuana have always been treated differently from claims that the smell of burnt marijuana has been detected. "While the Seventh Circuit has held that the scent of burning marijuana alone, if detected, can justify a *Terry* stop, decades of appellate cases discussing an officer smelling raw marijuana entailed physical characteristics—like proximity to, and amount of, marijuana." *United States v. Gray*, 548 F. Supp. 3d 807, 813 (S.D. Ind. 2021) (quotations and citations omitted) (collecting cases). Stated another way, an officer's claim that he smells raw marijuana are more believable when he is near lots of marijuana, and less so when he is far from small amounts.

At first blush, this case falls in the latter category. Radecki claims to have been up to thirty feet from the Hillsdale Residence when he detected not just the scent of marijuana, but an "overwhelming odor." Given that distance, one would expect that officers would have found a large amount of marijuana in the home. Yet only 3.5 grams, or about ten joints worth[3], were found. Radecki's claims of an "overwhelming odor" do start to look incredulous on these facts.

The Government counters by pointing out that, when Radecki claims to have been overwhelmed by the smell of marijuana, more of the substance may have been at the home. The Government points out that Defendant was seen loading containers into a vehicle shortly before the search of the Hillside Residence, and those containers were later found to contain ten ounces, or close to 300 grams, of marijuana. The Government claims that "[t]his quantity of marijuana could most assuredly emit a strong odor detectible from a distance away." (ECF No. 40 at 11).

Whatever superficial appeal the Government's argument has is undermined by Radecki's demonstrated pot-smelling abilities. Remember, this investigation began with Radecki inspecting and handling a package that held 500 grams of marijuana, nearly twice as much as the Government's top-end estimate of the amount of marijuana in the Hillside Residence. But nowhere in the affidavit supporting the warrant request for the package or the Hillside Residence does Radecki ever claim to have smelled this much higher amount of the substance.[4] Even the amount of marijuana found in the vehicle, then, does little to bolster Radecki's claims.

---

[3] Niraj Chokshi, *How Much Weed Is in a Joint? Pot Experts Have a New Estimate*, THE NEW YORK TIMES, (Nov. 14, 2022, 3:20 p.m.), https://www.nytimes.com/2016/07/15/science/how-much-weed-is-in-a-joint-pot-experts-have-a-new-estimate.html#:~:text=To%20account%20for%20those%20variations,Dr.

[4] The Government notes that the package was "heavily taped at the seams" (ECF No. 40 at 17), perhaps to explain the lack of an overwhelming odor of marijuana coming from the package. But given that the events here occurred on February 4, it is just as likely that Hillside Drive was closed up to keep the occupants warm. In any event, without the placement of 3.5 grams, or 300 grams, of marijuana directly behind an industrial fan aimed in Radecki's direction, his claim of an "overwhelming odor" 30 feet from the house raises suspicions.

The Government also argues that Defendant's complaints with the probable cause affidavit are not material to the probable cause determination. The Court is inclined to agree with the Government, but not for the reasons it advances. Put simply, the Court is not convinced that the warrant application establishes probable cause, overwhelming odor or not.

The Government first argues that the package by itself establishes probable cause to search the home because "[i]ntercepted packages containing a distribution quantity of controlled substances provide sufficient probable cause for a search warrant to search the residence to which the package is addressed." (*Id*. at 18). But the Government's authorities do not stand for the broad proposition it advances. *United States v. Calligan*, 8 F.4th 499 (7th Cir. 2021), a case originating in this Court, dealt with a defendant that had received more than fifty international shipments, including four in the month before he was arrested, many from a known source of narcotics. (*Id*. at 502). In *United States v. Dessart*, 823 F.3d 395 (7th Cir. 2016), customs officials intercepted three packages containing suspected controlled substances, performed a controlled delivery of one, and accessed a website run by the defendant where he was advertising controlled substances for sale. (*Id*. at 398-99). Finally, in *United States v. Delgado*, 981 F.3d 889 (11th Cir. 2020), customs officials intercepted two packages, both sent by the same shipper and addressed to the defendant, both containing narcotics, and confirmed that defendant resided at the delivery address.

Compare the facts of those cases to those here. Neither Defendant, nor anyone else at the Hillside Residence, ever received a package containing narcotics (at least based on the information presented to the magistrate). The package wasn't addressed to anyone at the Hillside Residence, per Radecki's extremely limited investigation. The package wasn't from a known drug distributor; Radecki didn't know anything about the sender. When he applied for the warrant, then, neither

6

Radecki nor the magistrate had any more reason to believe that the package was part of some larger drug distribution operation than they did that it was simply mislabeled.

And this is to say nothing of the other glaring issues with the warrant application. What "open and closed source investigative tools" did Radecki use to determine the validity of the phone numbers and addresses? Google? WhitePages.com? Why would Radecki believe that Spillman, a system mainly used for aggregating criminal and driving records, would have information on who was renting a particular home? Why, if he was just performing a "knock and talk," did Radecki choose to bring along any number of officers from the Allen County Drug Task Force?

So the scent, overwhelming or not, of marijuana may not save this warrant even if true. But where the veracity of Radecki's account does matter is in the Government's fallback argument of the good-faith exception under *United States v. Leon*, 468 U.S. 897, 927 (1984). The Court cannot address that argument until after the *Franks* hearing is held and the Court determines whether a *Franks* violation has occurred. The *Leon* good-faith exception does not apply when there is a *Franks* violation. *See Leon*, 468 U.S. at 923 (listing a *Franks* violation as one of four circumstances under which the good-faith exception does not apply); *United States v. Rees*, 957 F.3d 761, 771 (7th Cir. 2020) (same) (quoting *Leon*, 468 U.S. at 923). Again, perhaps this warrant is so facially deficient that no reasonably trained law enforcement officer would rely on it. But even if not, a finding that Radecki lied to the magistrate would seriously undercut any reliance by the Government on the *Leon* exception.

### III.     Conclusion

For these reasons, Defendant's Motion for *Franks* Hearing (ECF No. 37) is GRANTED. The Court will set a date and time for the hearing by separate entry. Defendant's motions to

suppress (ECF Nos. 35, 38) will be held under consideration pending the outcome of the *Franks* hearing.

SO ORDERED on November 17, 2022.

                                           s/ *Holly A. Brady*
                                         JUDGE HOLLY A. BRADY
                                         UNITED STATES DISTRICT COURT